**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 0 3 2025

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

**GALACTIC HOLDINGS LLC**                                                      **PLAINTIFF**

v.                                    Case No. 2:25-cv-66-JM

**ST ENGINEERING AEROSPACE LTD**                                               **DEFENDANT**

## COMPLAINT

Plaintiff, Galactic Holdings LLC, for its Complaint against ST Engineering Aerospace Ltd, states as follows:

### PARTIES

1. Galactic Holdings LLC ("Galactic") is a Delaware limited liability company, and Galactic's several members are citizens of Arkansas, Georgia, Tennessee, and Florida.

2. Galactic is an Arkansas-based company that developed a brilliant idea, an idea with the potential to revolutionize aerial firefighting not only in the United States, but across the globe.

3. ST Engineering Aerospace Ltd ("ST Engineering") is a massive, multinational-engineering company established under the laws of Singapore with a registered office at 540 Airport Road, Paya Lebar, Singapore 539938. ST Engineering is a citizen of Singapore and boasts annual revenues in the *multiple billions* of dollars.

4. According to its website, one of ST Engineering's core values is "integrity," and, pursuant to that core value, ST Engineering "believe[s] [that] the foundation of [its] business success rests on unyielding honesty, trustworthiness and responsibility for [its] actions, striving to do the right thing and to fulfill [its] promises to . . . [its] customers, partners, and stakeholders."

This case assigned to District Judge Moody
and to Magistrate Judge Moore

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) as it is a civil action between Galactic, a citizen of the United States (namely, a citizen of Arkansas, Georgia, Tennessee, and Florida), and ST Engineering, a citizen or subject of a foreign state (namely Singapore). The amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this civil action raises claims under the laws of the United States.

6. One of the members of Galactic is a resident of Monroe County, Arkansas. The case is thus properly filed in the Delta Division of this Court.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) both because (i) this is the district in which a substantial part of the events or omissions giving rise to Galactic's claim occurred, and (ii) Galactic and ST Engineering agreed that "[a]ny dispute arising out of or in connection with [their] Agreement, including any issue regarding its existence, validity or termination, shall be referred to and finally by suit filed and litigated in the United States District Court for the Eastern District of Arkansas. . . ." This agreement is memorialized in a contract titled Galactic and ST Engineering's Design, Development and Aircraft Modification Service Agreement for a Conversion of Passenger B757-200 to a Fire Fighting Platform (the "Initial Agreement").[1]

---

[1] This contract was signed by both parties. Both parties have a copy and know its contents. Out of a concern for confidentiality of contract provisions unrelated to this suit, a copy is not attached here, but Galactic will provide a copy to the Court if requested. It will also be disclosed in discovery.

## BACKGROUND

8.     Worldwide, over the last decade, wildfires have become both (i) increasingly common and (ii) perhaps worse, increasingly disastrous.[2]

9.     In 2019-2020, for example, Australia's *Black Summer* wildfire season saw *almost 50 million acres* of land burned.[3]

10.    Closer to home, around the same time, California fought the Camp Fire—the deadliest and most destructive wildfire in California history[4]—the August Complex Fire, one of California's largest,[5] and the Dixie Fire, costing more than half-a-billion dollars to suppress.[6]

11.    To successfully fight these massive wildfires, governments across the globe employ a variety of tactics, one of the most important of which is known as "aerial firefighting," or, more informally in industry parlance: "waterbombing."

12.    Waterbombing has been around for decades, but the industry has long suffered from a classic Goldilocks problem: traditional firefighting airplanes are either (i) too small, and do not

---

[2] *See, e.g., Wildfire Climate Connection*, NAT'L OCEANIC & ATMOSPHERE ADMIN., https://www.noaa.gov/noaa-wildfire/wildfire-climate-connection (last visited March 25, 2025).

[3] *Black Summer*, AUSTRALIAN PUB. SERV. COMM'N, https://www.apsc.gov.au/state-service/state-service-report-2019-20/chapter-1-commitment-service/black-summer (last visited March 25, 2025).

[4] *Camp Fire Air Quality Data Analysis*, CAL. AIR RES. BD., https://ww2.arb.ca.gov/resources/documents/camp-fire-air-quality-data-analysis?keywords=2025 (last visited March 25, 2025).

[5] *August Complex Restoration*, U.S. FOREST SERV., https://www.fs.usda.gov/detail/mendocino/home/?cid=FSEPRD860382 (last visited March 25, 2025).

[6] Francisco Tutella, *California's Dixie Fire Shows Impact of Legacy Effects, Prescribed Burns*, Penn. State (June 27, 2022), https://www.psu.edu/news/earth-and-mineral-sciences/story/californias-dixie-fire-shows-impact-legacy-effects-prescribed.

3

carry enough water per load to effectively address the massive wildfires of the modern era, or (ii) are too big, and cannot takeoff from many of the short, medium, or high-altitude runways necessary to effectively fight wildfires with any reasonable degree of efficiency.

13. That is, until Galactic came along.

14. Over several years, Galactic discovered a unique solution to the waterbombing industry's Goldilocks problem: the B757-200 airplane.

15. Commonly known as the "workhorse of the sky," the B757-200, while large, is also capable of taking off from short, medium, and high-altitude runways that most large waterbombers cannot, making it "just right" for addressing the waterbombing industry's key needs.

16. Even more ingenious, globally, B757-200s are reaching an age at which airliners must retire the planes from passenger service, meaning that over the next several years, hundreds of B757-200s will be on the market—at a relatively cheap price—seeking a new application.

17. Foreseeing the extraordinary potential lying within this unique market niche, Galactic decided to "go big or go home," and, in late 2020, to ensure that Galactic could exploit its vision to the maximum extent possible—with all deliberate speed—Galactic sought bids from the world's largest aviation-engineering firms to assist in converting the B757-200 from a passenger application to an aerial fire-fighting platform.

18. ST Engineering provided a bid.

19. After doing its due diligence, Galactic thought, surely, ST Engineering, one of the largest, most sophisticated aviation-engineering firms in the world—championing the core value of "integrity"—would do a great job, and they would certainly do it in a timely fashion, too.

20. Galactic was particularly excited about the prospect of working with ST Engineering because ST Engineering's bid was right where Galactic needed it to be. Had ST Engineering's bid been any higher, Galactic would have almost certainly gone elsewhere.

21. Following the bid, Galactic and ST Engineering proceeded to enter the Initial Agreement, the core purpose of which is described in its two recitals:

> WHEREAS, [Galactic] desires to engage [ST Engineering] to perform design, development, and modifications on its aircraft with the ultimate goal of obtaining an STC[7] for [Galactic]; and
>
> WHEREAS, [ST Engineering] is able and willing to design, development and modifications on [Galactic's] aircraft with the terms and conditions of this Agreement to obtain an STC for [Galactic] in [Galactic's] name.

22. Crucially, the parties also agreed in the Initial Agreement that all intellectual property developed during their relationship would belong exclusively to Galactic:

> **17. INTELLECTUAL PROPERTY**
>
> 17.1 For the purposes of this Agreement:
>
> 17.1.1 "Foreground Rights" means Intellectual Property rights arising out of the performance of this Agreement to include the STC.
>
> 17.1.2 "Intellectual Property" means copyright, and all rights in relation to inventions, registered and unregistered trademarks (including service marks), registered and unregistered designs, circuit layouts, know how, other proprietary information and data and any other rights resulting from intellectual activity in the industrial, scientific, literary and artistic fields.
>
> 17.2 All rights or title to, or interest in, Foreground Rights shall be owned by [Galactic.]

---

[7] An "STC" or "supplemental type certificate" is a type certificate ("TC") issued by the Federal Aviation Administration ("FAA") when an applicant has received FAA approval to modify an aeronautical product from its original design. It is basically the FAA's seal of approval for an aircraft modification.

> 17.2.1 [Galactic] hereby grants to [ST Engineering] the right to utilize the Foreground Rights for the purposes of performing its obligations under this Agreement, but no other.

23. And, to ensure that Galactic could reap the benefits of the intellectual property, the parties agreed that ST Engineering would complete the work in accordance with the time horizons outlined in the Initial Agreement's Schedule A. The parties understood timing was critical for Galactic to maximize its profits on the intellectual property.

24. Contingent on positive results from ST Engineering's feasibility study (at a cost of $880,000.00 to Galactic), pursuant to the Initial Agreement's Schedule A, ST Engineering promised to provide a completely certified, fully functional, aerial-firefighting B757-200 in just 2.5 years—and at an extremely competitive price, to boot.

25. And the feasibility study was key: the parties agreed that "[i]n the event the project proceeds beyond Phase 1 [the feasibility study phase] after Seller has warranted that it can issue the STC and then Seller fails to do so, the Buyer shall be entitled to a refund of *all sums paid to the Seller* with the exception of the $880,000.00 paid for the Phase 1 studies . . . .".

26. After ST Engineering completed its feasibility study, and the parties forged ahead past Phase 1, it did not take long for delays and proposed price increases to begin.

27. Some of these initial delays and price increases were understandable. After all, converting a B757-200 into a waterbomber is no small feat—perhaps that is why no one has succeeded before—and much like a contractor digging into an old house for a remodel, certain problems will not appear until after the walls are torn down and the contractor gets a look inside.

28. Accordingly, on May 18, 2022, Galactic and ST Engineering entered the Design, Development and Aircraft Modification Service Agreement for a Conversion of Passenger B757-

200 to a Firefighting Platform, Variation Agreement No. 1 (the "Modification Agreement")[8] which, in short, both: (i) extended ST Engineering's time for performing various tasks, and (ii) provided for price increases to ST Engineering's benefit, among other, more minor things. The rest of the Initial Agreement remained in effect.

29. In the Modification Agreement, ST Engineering doubled down, promising to provide a "turnkey solution to [Galactic]."

30. Over the next couple years, despite the Modification Agreement, ST Engineering repeatedly failed to hit the Initial Agreement's (as amended by the Modification Agreement) strictly-delineated targets, both in terms of time and costs.

31. To be fair, not all the delays were solely attributable to ST Engineering. For example, a major hailstorm in Spring 2023 caused significant damage to Galactic's aircraft, thereby contributing to delays.

32. Or, as another example, on a few occasions, Galactic's aircraft had minor maintenance issues—which Galactic resolved quickly, and at Galactic's expense—also a contributor to some of the downtime.

33. But the lion's share of the *several years* of delays and price increases are attributable solely to ST Engineering.

34. Indeed, although the parties agreed that ST Engineering would perform in accordance with a clearly defined, strict timetable—with specific deliverables due at precise intervals—ST Engineering has flaunted such timelines by, among other things: blending the

---

[8] As with the Initial Agreement, the Modification Agreement was signed by both parties, each of which has a copy. Galactic will provide a copy to the Court if requested. It will also be disclosed in discovery.

intervals, omitting certain deliverables, and even outright skipping others, all without Galactic's required approval.

35. To illustrate the point briefly, ST Engineering recently hit the D5 milestone, something that ST Engineering was supposed to surpass as long ago as *August 2022*.

36. Worse yet, although Galactic initially tried to work with ST Engineering on these delays and cost overruns, things took a turn for the worse in Summer 2024 when ST Engineering began making unreasonable demands on Galactic.

37. In August 2024, ST Engineering sent Galactic a draft, second amendment to the Initial Agreement which, like the Modification Agreement, sought both (i) significant extensions for ST Engineering's performance, and (ii) *substantial* price increases to ST Engineering's benefit.

38. Even the term "substantial" is somewhat of a misnomer: in a February 2025 proposal propounded by ST Engineering, it proposed a price increase from $22.75 million (a number the parties had already increased in the Modification Agreement) to the *whopping* sum of almost *$50 million*—more than double the price for the entire contract.

39. Galactic's investors, already infuriated at ST Engineering's glacial pace and many broken promises, refused to contribute additional capital to the project beyond what Galactic was contractually obligated to pay, but they were at least willing to work with ST Engineering on an extension of time for ST Engineering's performance.

40. Before Galactic could substantively respond to the proposed second amendment to the Initial Agreement, ST Engineering—arbitrarily and without authority or right—sent Galactic a "Notice of Work Stoppage" and sought to force Galactic's hand on the proposed second amendment by stating that ST Engineering would not continue work on the project until after the

parties "reassessed" the schedule and the price. A true and correct copy of the Notice of Work Stoppage is attached hereto as **Exhibit A** and incorporated by reference as if fully set forth herein.

41. From that point, the parties' relationship quickly deteriorated, and, to date, ST Engineering has not re-commenced performance of its contractual obligations.

42. The stoppage of work was not the worst of it. Not long after the stoppage, ST Engineering began surreptitiously restricting Galactic's access to Galactic's Foreground Rights and Intellectual Property (as those terms are defined in the Initial Agreement).

43. For example, for the last several years, the parties had *thousands* of drawings, designs, and system layouts uploaded and stored in an online database, but for substantial periods of time in late 2024 and early 2025, ST Engineering quietly restricted Galactic's access to them.

44. As the parties continued to try and resolve their differences, on at least one occasion, ST Engineering higher-ups told Galactic representatives that ST Engineering had "talked with several other customers" who had expressed serious interest in the Galactic project—of particular note, Chinese companies.

45. Such actions caused Galactic sincere concern because, to work with these customers, ST Engineering would necessarily *have* to use *Galactic's* Foreground Rights and Intellectual Property.

46. Then, in early 2025, ST Engineering higher-ups met with Galactic leaders and suggested that, as part of the proposed second amendment to the Initial Agreement, Galactic should agree to *co-own* its intellectual property with ST Engineering.

47. That is when it all started to make sense—ST Engineering never intended to abide by its promises in the Initial Agreement, or even those made in the Modification Agreement, but instead, all along, ST Engineering intended to trap Galactic in an ever-deepening abyss of delays

and price increases to extort Galactic's most prized possessions right from under its nose: namely, Galactic's Foreground Rights, Intellectual Property, and its unique market niche.

48.     In short, despite its championed notions of "integrity" and "do[ing] the right thing" for its customers, ST Engineering has turned Galactic's dream into a multi-million-dollar nightmare. Time and again, ST Engineering has broken promises and sought to take advantage of Galactic's goodwill, but Galactic will stand for it no longer.

## CAUSES OF ACTION

*Count I: Breach of Contract*

49.     Galactic realleges, adopts, and incorporates by reference the allegations in the preceding paragraphs.

50.     Galactic and ST Engineering entered the Initial Agreement, amended by the Modification Agreement.

51.     The Initial Agreement, as amended by the Modification Agreement, is a valid, binding contract under Arkansas law.

52.     ST Engineering promised, among other things, to deliver a fully functional, completely certified, aerial-firefighting B757-200—a "turnkey solution"—in accordance with both (i) the time conditions, and (ii) price parameters outlined by the Initial Agreement, as amended by the Modification Agreement, in exchange for Galactic's timely payments.

53.     At all times relevant, Galactic has made its required payments in a timely manner and has otherwise abided by all its material obligations under the Initial Agreement, as amended by the Modification Agreement.

54.     Despite Galactic's performance, ST Engineering has failed to comply with its timelines for performance outlined in the Initial Agreement, as amended by the Modification

Agreement, and has failed to honor price parameters that the parties outlined in the Initial Agreement, as amended by the Modification Agreement, both of which are material obligations.

55. Indeed, instead of abiding by these material obligations, ST Engineering has ceased performance under the Initial Agreement, as amended by the Modification Agreement, and has repeatedly demanded both (i) unreasonable extensions of time, and (ii) unreasonable price increases.

56. In short, ST Engineering materially breached the Initial Agreement, as amended by the Modification Agreement, and Galactic is entitled to damages flowing from ST Engineering's breaches, including but not limited to a refund of all sums paid.

57. Galactic is also entitled to (i) its attorneys' fees incurred in prosecuting this suit, *see* Ark. Code Ann. § 16-22-308, as well as (ii) pre- and post-judgment interest, *see* Ark. Code Ann. § 16-65-114.

*Count II: Misappropriation of Trade Secrets under Arkansas Trade Secrets Act*

58. Galactic realleges, adopts, and incorporates by reference the allegations in the preceding paragraphs.

59. Galactic owns numerous trade secrets for which it derives economic value from the fact that the secrets are not known to their competitors and are not readily ascertainable by proper means.

60. Galactic's trade secrets include, but are not limited to: (i) its Emergency Dump System, (ii) its Door Locking Mechanism, (iii) its Drop Doors Seal, (iv) its Gravity Assist System, and (v) its Hydraulic Flow Divider.

61. Galactic has taken reasonable steps to safeguard the secrecy of the trade secrets, including by drafting strict confidentiality provisions into its contractual agreements with parties

who may have access to the trade secrets and restricting knowledge of the trade secrets to only those within Galactic's corporate hierarchy who are on a need to know basis.

62. ST Engineering has misappropriated Galactic's trade secrets by acquiring the trade secrets by improper means, restricting Galactic's access to its own trade secrets, and/or by disclosing or using the trade secrets without Galactic's consent.

63. ST Engineering's access to the trade secrets was provided under circumstances giving rise to a duty to maintain their secrecy or limit their use because the secrets were only to be used to accomplish the parties' contract for Galactic's benefit.

64. ST Engineering's actions constitute actual and/or threatened misappropriation of Galactic's trade secrets in violation of the Arkansas Trade Secrets Act, Ark. Code Ann. § 4-75-601 *et seq*. Galactic is entitled to recover all actual damages caused by ST Engineering's misappropriation.

65. Further, pursuant to Ark. Code Ann. § 4-75-604, Galactic requests an injunction prohibiting ST Engineering's future use of the trade secrets.

66. Galactic is entitled to recover its attorney's fees and costs incurred in this action pursuant to Ark. Code Ann. § 4-75-604 because the misappropriation was willful and malicious.

*Count III: Misappropriation of Trade Secrets under Federal Defend Trade Secrets Act*

67. Galactic realleges, adopts, and incorporates by reference the allegations in the preceding paragraphs.

68. Under the Federal Defend Trade Secrets Act ("DTSA"), the "owner of a trade secret that is misappropriated may bring a civil action … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836 (b)(1).

69. Galactic owns numerous trade secrets for which it derives economic value from the fact that the secrets are not known to their competitors and are not readily ascertainable by proper means.

70. Galactic's trade secrets include but are not limited to: (i) its Emergency Dump System, (ii) its Door Locking Mechanism, (iii) its Drop Doors Seal, (iv) its Gravity Assist System, and (v) its Hydraulic Flow Divider.

71. The trade secrets are intended for products, namely, firefighting aircraft, intended to be used in interstate commerce.

72. Galactic has taken reasonable steps to safeguard the secrecy of the trade secrets, including by drafting strict confidentiality provisions into its contractual agreements with parties who may have access to the trade secrets and restricting knowledge of the trade secrets to only those within Galactic's corporate hierarchy who are on a need to know basis.

73. ST Engineering has misappropriated Galactic's trade secrets by acquiring the trade secrets by improper means, restricting Galactic's access to its own trade secrets, and/or by disclosing or using the trade secrets without Galactic's consent.

74. ST Engineering's access to the trade secrets was provided under circumstances giving rise to a duty to maintain their secrecy or limit their use because the secrets were only to be used to accomplish the parties' contract for Galactic's benefit.

75. ST Engineering's actions constitute actual and/or threatened misappropriation of Galactic's trade secrets in violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* Galactic is entitled to recover all actual damages caused by ST Engineering's misappropriation.

76. As a result of ST Engineering's actions, Galactic has been, and continues to be, substantially injured or damaged. Galactic will continue to suffer irreparable harm and is entitled to injunctive relief pursuant to 18 U.S.C § 1836(b)(3)(A).

77. Pursuant to 18 U.S.C. § 1836(b)(3)(C), Galactic is entitled to exemplary damages for ST Engineering's willful and malicious misappropriation of the trade secrets.

78. Galactic is entitled to recover all actual damages caused by ST Engineering's misappropriation.

79. Pursuant to 18 U.S.C. § 1836(b)(3)(D), Galactic is entitled to recovery of its attorneys' fees because of ST Engineering's willful and malicious misappropriation of the NT Parties' trade secrets.

### NATURE OF RELIEF SOUGHT AND JURY DEMAND

80. Therefore, Galactic requests that this Court award it the following relief:

    a. Compensatory, consequential, and all other monetary damages to which Galactic is entitled;

    b. Exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

    c. Preliminary and permanent injunctive relief pursuant to Ark. Code Ann. § 4-75-604 and 18 U.S.C. § 1836(b)(3)(A) prohibiting ST Engineering's future use of Galactic's trade secrets, or, alternatively, if this Court determines that it would be unreasonable to prohibit future use of Galactic's trade secrets, Galactic requests injunctive relief conditioning ST Engineering's future use of Galactic's trade secrets upon payment of reasonable royalties;

  d. Pre- and post-judgment interest as allowed by Arkansas law, *see* Ark. Code Ann. § 16-65-114; and

  e. Costs and attorneys' fees pursuant to Ark. Code Ann. § 4-75-607, Ark. Code Ann. § 16-22-308, and 18 U.S.C. § 1836(b)(3)(D).

  f. Galactic demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff Galactic Holdings LLC respectfully requests that this Court enter judgment in its favor against Defendant ST Engineering Aerospace Ltd; enjoin ST Engineering Aerospace Ltd as requested herein; award Galactic actual, consequential, and exemplary damages together with pre- and post-judgment interest; award Galactic its costs and attorneys' fees; and award Galactic all other relief that this Court deems just and proper.

              Respectfully submitted,

              Rose Law Firm,
              a Professional Association
              120 East Fourth Street
              Little Rock, Arkansas 72201
              Telephone: (501) 375-9131

              Byron J. Walker
              Arkansas Bar No. 2002114
              bwalker@roselawfirm.com

              Adam L. Hopkins
              Arkansas Bar No. 2006282
              ahopkins@roselawfirm.com

              Tyler D. Mlakar
              Arkansas Bar No. 2022150
              tmlakar@roselawfirm.com

              *Attorneys for Plaintiff Galactic Holdings LLC*

**ST Engineering Aerospace Ltd.**
**Engineering & Development Centre**

| | |
|---|---|
| **CO-ORDINATION MEMO** | CM NO: P377/CM/GH/2024/001 |
| 757 P2T | |

TO: Galactic Holdings                              DATE: 06 Nov 2024

SUBJECT: Work stoppage for 757-P2T Program

REPLY BY: -    TYPE: REQUEST | - | REPLY | - | INFORMATION | X |

OTHER REFERENCE: -

Total Number of pages (including this page): 1

i. In April 2024, *Cabin Interiors & Engineering Solutions* (CIES) formally highlighted the foreseeable cost escalations to *Galactic Holdings* (GH) and explained the key driving factors. Both parties expressed intent to work out a further Variation Agreement (VA) to update the commercial terms.

ii. CIES continued efforts to advance the 757-P2T program in good faith, incurring both in-house and subcontracted costs across engineering, certification, and supply chain & manufacturing.

iii. In August 2024, GH & CIES agreed to hold-off new financial commitments while the commercial arrangements were still being reviewed. Schedule impact to the program was noted.

iv. **A work stoppage has now become necessary**, to avoid incurring further costs. This stoppage applies to both in-house and subcontracted engineering and manufacturing work packages.

v. When a mutually agreeable commercial arrangement is within reach, the schedule and cost impact will need to be reassessed, considering the hiatus and the availability of resources. Re-sourcing of subcontractors may also be necessary.

Hong Tian Ci
2024.11.06
08:13:16 +08'00'

Tan Yen Ping
2024.11.06
09:01:18 +08'00'

ORIGINATOR: Hong Tian Ci                 APPROVED BY: Tan Yen Ping
Assistant Manager, Programme                          SVP/Head, CIES

DISTRIBUTION    GH – Darrin Henry, Kevin Vondran, Gibby Thomas
                STEA – Koh Wee Kuan, Hong Tian Ci

Form EDC/SOP/24/01 Rev -

Page 1 of 1

# EXHIBIT A