## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

**GALACTIC HOLDINGS, LLC**                                                   **PLAINTIFF**

### Case No. 2:25-cv-66-JM

**ST ENGINEERING AEROSPACE LTD.**                          **DEFENDANT**

### DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES,
### AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT

Defendant ST Engineering Aerospace Ltd. ("STEA"), by and through its undersigned counsel, files this Answer, Affirmative Defenses, and Counterclaim to Plaintiff Galactic Holdings LLC's ("Galactic") Complaint (Dkt. 1).

### ANSWER

### PARTIES

1.      STEA admits that Galactic is a Delaware limited liability company.  Except as so expressly admitted, STEA lacks information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 1 of the Complaint and therefore denies them.

2.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 2 of the Complaint and therefore denies them.

3.      STEA admits that it is an engineering company established under the laws of Singapore with a registered office at 540 Airport Road, Paya Lebar, Singapore 539938 whose annual revenue for the past several years has exceeded one billion dollars.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 3 of the Complaint.

4.      STEA admits the allegations in Paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.    The allegations in Paragraph 5 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA admits that the Court has subject matter jurisdiction over this action but denies that Galactic is entitled to any monetary relief in any amount, as Galactic's claims have no basis in fact or law.

6.    The allegations in Paragraph 6 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 6 of the Complaint and therefore denies them.

7.    The allegations in Paragraph 7 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA admits for purpose of this action only that venue is proper in this Court pursuant to Section 22.2 of the Design, Development and Aircraft Modification Service Agreement for a Conversion of Passenger B757-200 to a Fire Fighting Platform dated May 15, 2021 between Galactic and STEA ("Initial Agreement").  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 7 of the Complaint, including its characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof.

## BACKGROUND

8.    STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 8 of the Complaint and therefore denies them.  STEA further denies the allegations in Paragraph 8 of the Complaint as characterizations of the website cited in Paragraph 8 of the Complaint, and respectfully refers the Court to that website for a complete and accurate statement of its content.

9.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 9 of the Complaint and therefore denies them.  STEA further denies the allegations in Paragraph 9 of the Complaint as characterizations of the website cited in Paragraph 9 of the Complaint, and respectfully refers the Court to that website for a complete and accurate statement of its content.

10.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 10 of the Complaint and therefore denies them.  STEA further denies the allegations in Paragraph 10 of the Complaint as characterizations of the websites cited in Paragraph 10 of the Complaint, and respectfully refers the Court to those websites for a complete and accurate statement of their content.

11.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 11 of the Complaint and therefore denies them.

12.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 12 of the Complaint and therefore denies them.

13.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 13 of the Complaint and therefore denies them.

14.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 14 of the Complaint and therefore denies them.

15.      STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 15 of the Complaint and therefore denies them.

16.      STEA denies the allegations in Paragraph 16 of the Complaint.

17.      STEA admits that in 2020, Galactic sought a bid from STEA to assist in converting a B757-200 from a passenger application to an aerial fire-fighting platform.  Except

as so expressly admitted, STEA lacks information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 17 of the Complaint and therefore denies them.

18.     STEA admits the allegations in Paragraph 18 of the Complaint.

19.     STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 19 of the Complaint and therefore denies them.

20.     STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 20 of the Complaint and therefore denies them.

21.     STEA admits that Galactic and STEA entered into the Initial Agreement following STEA's submission of a bid to Galactic.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 21 of the Complaint as characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof.

22.     STEA admits that Paragraph 22 of the Complaint accurately quotes Section 17 of the Initial Agreement.  Except as so expressly admitted, STEA denies the allegations in Paragraph 22 of the Complaint as characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof.

23.     STEA denies the allegations in Paragraph 23 of the Complaint, including as characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof.

24.     STEA denies the allegations in Paragraph 24 of the Complaint as characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof. STEA further states that the original milestones and timeline set forth in Schedule A of the Initial

Agreement were contingent upon Galactic's timely completion of its prerequisite obligations under the Initial Agreement, which Galactic failed to do.  Additionally, the Initial Agreement expressly provided for the originally specified timeline to be "updated upon completion of Phase 1," and the parties' subsequently executed Variation Agreement No. 1 dated May 18, 2022 ("Modification Agreement") to the Initial Agreement provided expressly for both review and adjustment of the project timeline and the final prototype aircraft price.

25.     STEA admits that Paragraph 25 of the Complaint accurately quotes an excerpt from Paragraph 18.5 of the Initial Agreement.  Except as so expressly admitted, STEA denies the allegations in Paragraph 25 of the Complaint as characterizations of a written document, the Initial Agreement, and respectfully refers the Court to the Initial Agreement (attached as Exhibit A to the Counterclaims) for the full content thereof.

26.     STEA admits that it performed a feasibility study pursuant to the Initial Agreement.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 26 of the Complaint.  STEA further states that delays in the project and resulting price increases were caused by (i) Galactic's failures to abide by its obligations under the Initial Agreement, including failures to provide STEA with deliverables under the Initial Agreement for which Galactic was responsible, and (ii) Galactic's demands for STEA to perform additional design and modification beyond that contemplated by the Initial Agreement.

27.     STEA admits that it engaged in considerable engineering input and effort to convert a B757-200 passenger plane into a waterbomber.  Except as so expressly admitted, STEA lacks information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 27 of the Complaint and therefore denies them.

28.     STEA admits that Galactic and STEA entered into the Modification Agreement.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 28 of the

Complaint as characterizations of a written document, the Modification Agreement, and respectfully refers the Court to the Modification Agreement (attached as Exhibit B to the Counterclaims) for the full content thereof.

29.     STEA admits that Paragraph 29 of the Complaint quotes an isolated phrase from the Modification Agreement out of context.  Except as so expressly admitted, STEA denies the allegations in Paragraph 29 of the Complaint as characterizations of a written document, the Modification Agreement, and respectfully refers the Court to the Modification Agreement (attached as Exhibit B to the Counterclaims) for the full content thereof.

30.     STEA denies the allegations in Paragraph 30 of the Complaint and specifically denies that it was STEA's fault that any time or cost targets in the Initial Agreement, as amended by the Modification Agreement, were not hit.  STEA further states that any alleged failures to hit time or cost targets were caused by (i) Galactic's failures to abide by its obligations under the Initial and Modification Agreements, including failures to provide STEA with deliverables under the Initial and Modification Agreements for which Galactic was responsible, and (ii) Galactic's demands for STEA to perform additional design and modification beyond that contemplated by the Initial Modification Agreements.  STEA also states that to the extent project timelines were extended, Galactic was fully apprised of and approved such extensions.

31.      STEA admits that delays were attributable to Galactic, including delays in delivering Galactic's aircraft to STEA for it to perform work on the aircraft.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 31 of the Complaint, including any implication that any delays were "solely attributable" to STEA.

32.     STEA admits that Galactic's aircraft had a number of maintenance issues that resulted in downtime and project delay.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 32 of the Complaint and specifically denies that the

maintenance issues of Galactic's aircraft were "minor." To the contrary, Galactic's aircraft has been plagued by major maintenance issues, including a fuel leak, elevator malfunction, and various issues requiring engine, window, and tire replacement.

33.    STEA denies the allegations in Paragraph 33 of the Complaint and specifically denies that "the lion's share of the *several* years of delays and price increases are attributable solely to" STEA. STEA further states that the delays and price increases for which Galactic now seeks to blame STEA were caused by (i) Galactic's failures to abide by its obligations under the Initial and Modification Agreements, including failures to provide STEA with deliverables under the Initial and Modification Agreements for which Galactic was responsible, and (ii) Galactic's demands for STEA to perform additional design and modification beyond that contemplated by the Initial and Modification Agreements.

34.    STEA denies the allegations in Paragraph 34 of the Complaint and specifically denies that it has altered the project timeline or deliverables without Galactic's approval. STEA further states that until it was forced to institute the November 2024 work stoppage, it kept Galactic informed of project status and STEA's intended actions and Galactic has been aware of and affirmatively approved or acquiesced to STEA's proposed course of action and timeline.

35.    STEA admits that the D5 milestone under the Modification Agreement ("prototype induction readiness review") was reached later than the "ARO + 15 months" (*i.e.* August 2022) timeline for D5 on the Modification Agreement's schedule for milestone payments. Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 35 of the Complaint and specifically denies that the delay in reaching the D5 milestone was STEA's fault. STEA further states that Galactic's own delays in procuring an aircraft and completing necessary maintenance for its return to service directly caused the delay in reaching the D5 milestone about which Galactic now complains. Although Galactic now faults STEA for

not completing the D5 milestone by "ARO + 15 months," Galactic did not even purchase the aircraft it wanted Galactic to convert until October 2022, which is ARO + 17 months, *i.e.* past the D5 milestone.  Galactic then spent months on maintenance of that aircraft to prepare it for return to service.  As a result of those delays, STEA could not obtain hangar space in the facility where the parties planned to conduct testing, which required that testing to be moved to a later date at a different facility and for STEA to undertake significant additional efforts to mitigate resulting harm to the project, including, for example, sourcing and arranging for the aircraft scanning of another Boeing 757 to provide inputs critical to the project.  Ultimately, because of Galactic's airplane purchase and maintenance delays, the aircraft was not inducted and available for testing until July 2023, *i.e.* ARO + 26.  And even then, the aircraft Galactic delivered was not in a serviceable configuration, requiring STEA to engage in additional mitigation to correct the issues.  Thus, it was Galactic's failures and delays that caused delayed completion of the D5 milestone.

36.    STEA denies the allegations in Paragraph 36 of the Complaint and specifically denies that it made "unreasonable" demands on Galactic.  STEA further states that it repeatedly attempted to work with Galactic to fairly address the delays and cost overruns caused by Galactic's actions.  By its words, actions, and silence, Galactic induced STEA to expend further resources and efforts on the project, for which it refuses to fairly compensate STEA.

37.    STEA admits that in August 2024 it sent Galactic a revised draft Variation Agreement No. 2 to the Initial Agreement and Modification Agreement.  STEA further states that it made multiple prior proposals for Variation Agreement No. 2 to Galactic in 2023 and 2024, including providing an initial draft of a Variation Agreement No. 2 to Galactic in September 2023.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 37 of the Complaint as characterizations of a written document, the August 2024 draft

Variation Agreement No. 2, and respectfully refers the Court to that document for the full content thereof.

38.    STEA admits that it made a February 2025 proposal to Galactic.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 38 of the Complaint, including as characterizations of a written document, the February 2025 proposal, and respectfully refers the Court to that document for the full content thereof.

39.    STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 39 of the Complaint regarding the state of mind or actions of Galactic's investors and therefore denies them.  STEA denies the remaining allegations in Paragraph 39 of the Complaint.

40.    STEA admits that on November 6, 2024, it sent Galactic a notice of work stoppage, and that a copy of that notice is attached as Exhibit A of Galactic's Complaint ("Notice of Work Stoppage").  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 40 of the Complaint, including as characterizations of a written document, the Notice of Work Stoppage, and respectfully refers the Court to Exhibit A of Galactic's Complaint for the full content thereof.  STEA further specifically denies that it sent its Notice of Work Stoppage either arbitrarily or without authority.  STEA also specifically denies that the Notice of Work Stoppage was sent "[b]efore Galactic could substantively respond to the proposed second amendment to the Initial Agreement."  STEA began discussions with Galactic as to the project's price increases in January 2023, provided a proposal for a second amendment to the Initial Agreement in April 2024, and supplied to Galactic a draft of a Variation Agreement No. 2 in August 2024.  STEA did not issue the Notice of Work Stoppage until early November 2024.  Thus, Galactic had months in which to "substantively respond" to STEA's proposals but instead delayed (without actually rejecting STEA's proposals or voicing substantive concerns with them)

to induce STEA to continue to expend substantial resources and efforts on the project.  Tellingly, Galactic supplied its own revised second amendment to the Initial Agreement only on November 15, 2024, a week *after* it received STEA's Notice of Work Stoppage and realized that its continued delay would no longer have the desired effect.

41.     STEA denies the allegations in Paragraph 41 of the Complaint.  STEA further states, by way of example, that after the Notice of Work Stoppage, STEA has continued to engage with third party vendors on matters relating to the Initial and Modified Agreements, including receiving and having to arrange payment for invoices for orders Galactic approved.

42.     STEA denies the allegations in Paragraph 42 of the Complaint and specifically denies that it has in any way restricted, "surreptitiously" or otherwise, Galactic's access to Galactic's Foreground Rights and Intellectual Property (as those terms are defined by the Initial Agreement).

43.     STEA denies the allegations in Paragraph 43 of the Complaint, and specifically denies that it has restricted, "quietly" or otherwise, Galactic's access to the drawings, designs, and system layouts uploaded and store in the project's OneDrive online database.  STEA further states that it made no change to Galactic's access rights to the project's OneDrive database or the contents thereof either in connection with or at any point after issuing the Notice of Work Stoppage.  Galactic continues to have the same access to the OneDrive folder as it had prior to the Notice of Work Stoppage and prior to "late 2024 and early 2025."  Indeed, access logs reflect that Galactic was able to, and in fact did, access and download contents of OneDrive folders containing materials for the project after the Notice of Work Stoppage was issued, in December 2024 and throughout the spring of 2025.

44.     STEA denies the allegations in Paragraph 44 of the Complaint.  STEA further states that Galactic itself has publicized the fact that Galactic and STEA were working on the

conversion of a passenger 757 aircraft for aerial firefighting in order to generate third party

interest.  Indeed, Galactic has approved and even encouraged STEA to present certain

information regarding the project at trade conventions, including because Galactic hopes to

generate revenue from future conversions for third parties done in conjunction with STEA.  In

instances where a third party expressed interest in the Galactic-STEA project to STEA, STEA

promptly notified Galactic of the inquiry, and did not share any non-public information about the

project with the third party.

45.    STEA denies the allegations in Paragraph 45 of the Complaint, and specifically

denies that any of its work with other existing or potential customers on aircraft conversions for

firefighting applications would "necessarily *have* to use *Galactic's* Foreground Rights and

Intellectual Property."  STEA further states that the Initial Agreement limits the Foreground

Rights to "Intellectual Property rights arising out of the performance of [the Initial] Agreement,"

which is an agreement specifically for the "conversion of [a] passenger B757-200 to a fire

fighting platform."  Passenger airplanes of various makes and models have been converted to

firefighting applications long before Galactic came into existence.  Such conversions, and the

specific conversion STEA is undertaking for Galactic, use pre-existing engineering knowledge

and know-how that STEA possesses.  Galactic has no claim to ownership of STEA's general

engineering knowledge and know-how, under the Initial or Modification Agreements or

otherwise, and Galactic cannot preclude STEA from using such general engineering knowledge

and know-how for the benefit of other customers and projects.

46.    STEA admits that in 2025, as part of the parties' communications to address

Galactic's failure to satisfy its obligations under the Initial and Modification Agreements,

Galactic indicated it did not want to pay the full amount of project cost overruns resulting from

its actions.  As a result, STEA offered as an alternative that Galactic and STEA co-own the

intellectual property developed in the course of the project in exchange for a lower upfront monetary payment.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 46 of the Complaint.

47.    STEA denies the allegations in Paragraph 47 of the Complaint and specifically denies that it has caused the delays or price increases of which Galactic complains, that it attempted to "extort" from Galactic any of its intellectual property, and that it has not satisfied its obligations under the Initial and Modification Agreements.

48.    STEA denies the allegations in Paragraph 48 of the Complaint and specifically denies that it has broken any promises or sought to take advantage of Galactic's goodwill.  STEA further states that, as detailed in its Counterclaims, Galactic, in fact, is the party that has flagrantly broken its promises to STEA and exploited STEA's goodwill.

## CAUSES OF ACTION
### *Count I: Breach of Contract*

49.    STEA incorporates its above responses to Paragraphs 1-48 of the Complaint and the subsequent paragraphs as if fully set forth herein.

50.    STEA admits the allegations in Paragraph 50 of the Complaint.

51.    The allegations in Paragraph 51 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA admits that the Initial and Modification Agreements were executed by the parties and that the Initial Agreement specifies that it "shall be governed by and construed in accordance with the laws of the state of Arkansas." Initial Agreement at § 22.1.

52.    STEA denies the allegations in Paragraph 52 of the Complaint as characterizations of written documents, the Initial and Modification Agreements, and respectfully refers the Court to the Initial and Modification Agreements (attached as Exhibits A

and B to the Counterclaims, respectively) for the full content thereof. STEA further states that its obligations under the Initial and Modification Agreements were contingent on Galactic's performance of its obligations, which Galactic failed to deliver, in a timely manner or at all.

53.     STEA denies the allegations in Paragraph 53 of the Complaint.

54.     STEA denies the allegations in Paragraph 54 of the Complaint.

55.     STEA denies the allegations in Paragraph 55 of the Complaint.

56.     STEA denies the allegations in Paragraph 56 of the Complaint.

57.     The allegations in Paragraph 57 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA denies the allegations in Paragraph 57 of the Complaint.

### *Count II: Misappropriation of Trade Secrets under Arkansas Trade Secrets Act*

58.     STEA incorporates its above responses to Paragraphs 1-57 of the Complaint and the subsequent paragraphs as if fully set forth herein.

59.     The allegations in Paragraph 59 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 59 of the Complaint and therefore denies them.

60.     STEA denies the allegations in Paragraph 60 of the Complaint and specifically denies that the "Emergency Dump System," "Door Locking Mechanism," "Drop Doors Seal," "Gravity Assist System," and "Hydraulic Flow Divider" used in the parties' conversion project are trade secrets. STEA further states that major elements of each of those designs are publicly known and/or readily ascertainable by proper means.

61.     STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 61 of the Complaint and therefore denies them.

62.     STEA denies the allegations in Paragraph 62 of the Complaint and specifically denies any misappropriation of trade secrets.

63.     STEA denies the allegations in Paragraph 63 of the Complaint.

64.     The allegations in Paragraph 64 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA denies the allegations in Paragraph 64 of the Complaint.

65.     STEA admits that Galactic has requested injunctive relief in the above-captioned litigation.  Except as so expressly admitted, STEA denies the remaining allegations in Paragraph 65 of the Complaint and specifically denies that Galactic is entitled to any injunctive relief.

66.     The allegations in Paragraph 66 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA denies the allegations in Paragraph 66 of the Complaint.

*Count III: Misappropriation of Trade Secrets under Federal Defend Trade Secrets Act*

67.     STEA incorporates its above responses to Paragraphs 1-66 of the Complaint and the subsequent paragraphs as if fully set forth herein.

68.     STEA denies the allegations in Paragraph 68 of the Complaint as a characterization of a federal statute and respectfully refers the Court to that statute for the full content thereof.

69.     The allegations in Paragraph 69 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 69 of the Complaint and therefore denies them.

70.     STEA denies the allegations in Paragraph 70 of the Complaint and specifically denies that the "Emergency Dump System," "Door Locking Mechanism," "Drop Doors Seal,"

"Gravity Assist System," and "Hydraulic Flow Divider" used in the parties' conversion project are trade secrets. STEA further states that major elements of each of those designs are publicly known and/or readily ascertainable by proper means.

71.    STEA denies the allegations in Paragraph 71 of the Complaint

72.    STEA lacks information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 72 of the Complaint and therefore denies them.

73.    STEA denies the allegations in Paragraph 73 of the Complaint and specifically denies it has misappropriated any alleged trade secrets.

74.    STEA denies the allegations in Paragraph 74 of the Complaint.

75.    The allegations in Paragraph 75 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA denies the allegations in Paragraph 75 of the Complaint.

76.    The allegations in Paragraph 76 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA denies the allegations in Paragraph 76 of the Complaint and specifically denies that Galactic has been substantially injured or damaged, has suffered or will continue to suffer irreparable harm, or is entitled to injunctive relief.

77.    The allegations in Paragraph 77 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA denies the allegations in Paragraph 77 of the Complaint.

78.    The allegations in Paragraph 78 of the Complaint are conclusions of law that do not require a response. To the extent that a response is required, STEA denies the allegations in Paragraph 78 of the Complaint.

79.     The allegations in Paragraph 79 of the Complaint are conclusions of law that do not require a response.  To the extent that a response is required, STEA denies the allegations in Paragraph 79 of the Complaint.  STEA further states that Paragraph 79 of the Complaint refers to "the NT Parties' trade secrets," but STEA has no knowledge of any parties known as the "NT Parties."

### NATURE OF RELIEF SOUGHT AND JURY DEMAND

80.     STEA denies the allegations in Paragraph 80 of the Complaint and specifically denies that Galactic is entitled to any relief in connection with its claims.

### AFFIRMATIVE DEFENSES

Without conceding that it bears the burden of proof or persuasion on any of the following defenses, STEA asserts the following Affirmative Defenses to Galactic's Complaint pursuant to Rule 8(c) of the Federal Rules of Civil Procedure.

### FIRST AFFIRMATIVE DEFENSE

Galactic has failed to state a claim, in whole or in part, upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Galactic's claims are barred, in whole or in part, because, at all times relevant to Galactic's Complaint, STEA acted in good faith.

### THIRD AFFIRMATIVE DEFENSE

Galactic's claims are barred, in whole or in part, by the doctrines of estoppel, waiver, laches, acquiescence, consent, and/or ratification.

### FOURTH AFFIRMATIVE DEFENSE

Galactic's claims are barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Galactic's claims are barred, in whole or in part, because any losses Galactic claims to have suffered were not the proximate result of and/or caused by any act and/or failure and/or omission to act attributable to STEA.

## SIXTH AFFIRMATIVE DEFENSE

Galactic's claims are barred, in whole or in part, as a result of Galactic's prior breaches of the parties' agreements.

## SEVENTH AFFIRMATIVE DEFENSE

Galactic's claims and requests for relief are barred, in whole or in part, by Galactic's failure to mitigate its claimed damages.

## EIGHTH AFFIRMATIVE DEFENSE

Galactic's demand to enjoin STEA is barred, as Galactic has suffered neither harm nor irreparable harm from STEA's actions.

## NINTH AFFIRMATIVE DEFENSE

Galactic's claims to costs or attorneys' fees are barred, in whole or in part, by applicable law or are otherwise unwarranted.

## TENTH AFFIRMATIVE DEFENSE

Galactic's claim for exemplary damages is unwarranted and unsupportable.

## ELEVENTH AFFIRMATIVE DEFENSE

STEA reserves the right to assert any additional defenses based upon information obtained throughout the course of this litigation.

WHEREFORE, STEA denies all liability to Galactic and respectfully requests that this Court enter judgment in its favor, and against Galactic, and further award STEA its costs and expenses, including attorneys' fees pursuant to Ark. Code Ann. § 16-22-308, in connection with

defending against Galactic's claims, along with any other relief that the Court deems just and appropriate.

## COUNTERCLAIMS

Defendant and Counterclaimant, ST Engineering Aerospace LTD ("STEA"), by and through its undersigned counsel, files the following Counterclaim against Plaintiff Galactic Holdings LLC ("Galactic" or "GH"), and states as follows:

## NATURE OF THE ACTION

1.     STEA files this counterclaim seeking monetary damages for the harm it suffered as a result of Galactic's failure to hold up its end of the bargain with STEA in connection with the parties' multi-year, multi-million-dollar effort to modify a Boeing B757-200 airplane into a tanker aircraft for use in aerial firefighting operations ("757 P2T Project" or "Project").

## PARTIES

2.     STEA is a corporation established under the laws of Singapore with a registered office at 540 Airport Road, Paya Lebar, Singapore 539938.

3.     Galactic has represented in its Complaint that it is a limited liability company incorporated under the laws of Delaware with members that are citizens of Arkansas, Georgia, Tennessee, and Florida.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over STEA's Counterclaims pursuant to 28 U.S.C. §§ 1332, 1367(a).

5.     This Court has personal jurisdiction over Galactic for purposes of STEA's Counterclaims because Galactic filed suit in this Court and because Section 22.2 of the Initial Agreement provides that "[a]ny dispute arising out of or in connection with this Agreement . . .

shall be referred to and finally by suit filed and litigated in the United States District Court for the Eastern District of Arkansas."

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and Section 22.2 of the Initial Agreement.

## FACTUAL BACKGROUND

7.    STEA is a global engineering corporation headquartered in Singapore with decades of experience in modifying and converting large aircraft for use in roles other than those for which the aircraft were initially built.

8.    STEA has converted more than 400 Boeing and Airbus passenger aircraft into freight transports since 1996 for clients around the world, including governments, major airlines, and international package delivery services.

9.    STEA, through a network of subsidiaries and affiliates, also provides maintenance, repair, and overhaul ("MRO") services to thousands of aircraft around the world.

10.    Galactic was formed in May 2020 by a small group of principles previously involved with providing small, propeller-driven aircraft for firefighting use.

11.    Shortly after Galactic's formation, the company solicited and accepted a bid from STEA to convert a Boeing 757-200 aircraft from a passenger application to an aerial firefighting platform.

12.    Upon information and belief, Galactic had no headquarters, full-time employees, or website at the time it accepted STEA's bid, nor had Galactic ever owned or operated a 757-200 aircraft or any aircraft of similar size prior to the initiation of the 757 P2T Project.

### A.    Galactic hires STEA to collaborate on the 757 P2T Project; the Parties execute Initial Agreement.

13.    On or about May 2021, STEA and Galactic entered into an agreement for the 757 P2T Project titled "Galactic and ST Engineering's Design, Development and Aircraft

Modification Service Agreement for a Conversion of Passenger B757-200 to a Fire Fighting Platform" ("Initial Agreement").  A true and correct copy of the Initial Agreement is attached as **Exhibit A.**

### *1.    Obligations of Galactic and STEA under the Initial Agreement.*

14.    The Initial Agreement set forth the parties' respective obligations according to their capacities and expertise to effectuate the modification of a 757-200 aircraft into an aerial firefighting platform.

15.    Under the Initial Agreement, Galactic agreed, among other things:

   a.    to deliver to STEA, at STEA's site in Mobile, Alabama, the aircraft to be modified.  *See* Ex. A § 6.1;

   b.    to "provide all the design data which includes design models, drawings, reports and manuals of the Air Tractor Fire Fighting System."  Ex. A, Schedule A § B(2);

   c.    to "support the development of the engineering package in fulfillment of the operational requirements for the firefighting platform to fulfill the National Forestry requirements."  *Id.*; and

   d.    to "provide at no cost to [STEA] access to all applicable design data including, but not limited to aircraft manuals, engineering drawings, interface control documents, test reports, structural design loads, updated electrical load analysis reports for both aircraft and the intended systems to be installed that are required for design ***in a timely manner***, etc."  Ex. A, Schedule E § A (emphasis added).

16.    STEA, on the other hand, agreed, among other things:

   a.    to "use [Galactic]'s existing Air Tractor Fire Fighting System as a baseline system to scale the control and gating system for a Boeing 757-200 series aircraft, provided this is practical and it is able to meet the desired requirement."  Ex. A, Schedule A § B(2);

   b.    to be "responsible for the entire design of the tank, engineering, design of Kit parts and aircraft modification for the conversion program utilizing part where manufactured by [Galactic] where possible to [STEA's] specifications."  *Id.*;[1]

---

[1] Capitalized terms not otherwise defined herein have the defined meanings ascribed to them in the parties' agreements.

c.  to "produce the scale drawings and specifications for each of the parts that are necessary to assemble the Kit that is to be installed on the aircraft." *Id.*;

d.  to provide to Galactic "[t]he drawings and specifications of each part" so that Galactic could, when possible, effectuate the manufacture of that part. *See id.*; and

e.  to "provide on-site support throughout the duration of the prototype, aircraft modification and [Interagency Air Tanker Board] certifications." *Id.*

17.  The Initial Agreement also provided that "[a]ny additional engineering services requested by Galactic Holdings during aircraft modification shall be considered as O&A charges" and set an Engineering Services hourly labor rate. *See* Ex. A, Schedule B § B. "O&A," along with the similar terms "Additional Services," "Over and Above Work," and "O&A Work," are defined as "additional maintenance services and modifications requested by Buyer at any time pursuant to Clause 4 which, when mutually agreed to in writing by [STEA] and [Galactic], shall become part of the Services." *See* Ex. A § 1.1.

### 2.  Schedule for the 757 P2T Project under the Initial Agreement.

18.  The Initial Agreement provided for the 757 P2T Project to be completed in four phases with rough estimates of how long each would take to complete:

- Phase 1: Feasibility Study and Conceptual Study Phase (3 months)

- Phase 2: Detailed Design Phase (7 months)

- Phase 3: Prototype Phase (18 months)

- Phase 4: Flight Test and Certification Phase (8 months)

Ex. A, Schedule A.

19.  Each phase, in turn, carried with it certain deliverables with preliminary estimates as to when those deliverables should be delivered, as reflected below ("Deliverables Table"):

| Phase | Deliverable No | Description of Deliverables | Period after Signing of Contract | Remarks |
|---|---|---|---|---|
| 1 | D1 | Conceptual Design Review | ARO + 3 months | A review will be completed at the 2 months mark |
| 2 | D2 | Preliminary Design Review | ARO + 6 months | To be updated upon completion of Phase 1 |
| | D3 | Critical Design Review | ARO + 10 months | |
| 3 | D4 | Prototype Induction Readiness Review | ARO + 18 months | |
| | D5 | Completion of Aircraft Prototype | ARO + 20 months | |
| 4 | D6 | Completion of Ground Acceptance Test (GAT) | ARO + 24 months | |
| | D7 | Completion of Flight Acceptance Test (FLAT) | ARO + 26 months | |
| | D8 | Completion of IAB Certification | ARO + 30 months | |

Note: "After Receiving Order (ARO)" of the fully signed Contract

Ex. A, Schedule A § A.

> ### 3. *Initial Agreement specifically defines the schedule and estimates for completion of deliverables as preliminary and provides for potential changes or delays.*

20.     At the time the Initial Agreement was executed, Galactic had not yet identified or acquired the 757-200 aircraft that would be converted for aerial firefighting, which was one of Galactic's obligations under the Initial Agreement.

21.     As a result, Schedule A of the Initial Agreement listed the subject aircraft's registration number and manufacturer serial number ("MSN") as "TBD." *See id*. § B(2)

22.     Galactic and STEA understood and agreed at the time the Initial Agreement was executed that the timetables set forth in the Deliverables Table were contingent upon Galactic providing STEA with a suitable 757-200 aircraft so STEA could perform certain vital testing on and measurements of the aircraft required for STEA to perform its design work, as reflected by the following:

> a.     The Initial Agreement expressly provides that the "[t]he schedule and deliverable milestone[s] [] set forth herein will be updated upon the completion of Phase 1." *See id.* § A

b. The Parties agreed for the "Induction Date"—defined in the Initial Agreement as "the date specified in Exhibit A upon which [STEA] is scheduled to begin the Services on an Aircraft," Ex. A § 1.1—that "for each day that the [a]ctual Induction Date exceeds the scheduled Induction Date, the scheduled Redelivery Date shall be extended by one (1) day, subject to slot availability." Ex. A, Schedule A.

c. Relevant to the "Induction Date," the Initial Agreement defines "Delivery" as "delivery by [Galactic] of the applicable Aircraft to [STEA's] facility for commencement of Services and acceptance thereof by [STEA] pursuant to an Aircraft Delivery Receipt in accordance with Schedule D." Ex. A § 1.1.

d. "Delivery Date" is defined as "the date of Delivery as specified in Schedule A of the applicable Aircraft by [Galactic] to the facility directed by [STEA]." *Id*.

e. Section 12.2 of the Initial Agreement provides that:

> [i]f, after Delivery of the Aircraft to the Seller's facility, the Aircraft is held pending:
>
>> [1] Receipt of Buyer's instructions.
>>
>> [2] Buyer's approval of cost estimate (if requested).
>>
>> [3] Receipt by Seller of initial or subsequent monies required to be paid hereunder (if applicable).
>>
>> [4] Receipt by Seller of BFE or documentation as required under Clause 9.
>>
>> [5] Receipt of Kit part from Buyer that delays work progress; or
>>
>> [6] Completion of any Acceptance Tests and for issue of the Aircraft Redelivery Receipt,
>
> and the event requires the Seller to remove the Aircraft from its work-in-progress and place the aircraft in storage, the Buyer shall be informed and the terms of the cost, expenses and risk as a result of such delays and action has to be mutually agreed upon.

*Id.* § 12.2. "BFE" is defined as "all modification Kits, Peculiar Materials, Peculiar Tooling, parts and materials and other items furnished by [Galactic] to [STEA] for the performance of Services." *Id.* § 1.1.

f. The Initial Agreement provides that, "[i]n the event of a delay under Clause 12.2, the Aircraft Delivery shall be extended, and Redelivery Date rescheduled, accordingly." *Id.* § 12.3.

23. Section 12.4 of the Initial Agreement further provides that when a party finds itself hindered in performance of its obligations under the Initial Agreement, the party "shall give prompt written notice to the other party of the circumstances which have arisen, their effect on the performance of its obligation under this Agreement, the anticipated duration of the circumstances, and ***shall take reasonable steps to mitigate the effects of any such delay***." *Id.* § 12.4 (emphasis added).

### 4. Galactic's payment obligations under the Initial Agreement.

24. Schedule B of the Initial Agreement sets forth the payments Galactic agreed to make to STEA for its services. Ex. A, Schedule B § A(1); *see also id.* § C (setting schedule for individual payments).

25. The Initial Agreement provides that "Subcontract work (for example, repairing or bench-testing components at local vendors) will be charged at invoiced value plus a mark-up of ten percent (10%) handling and administrative charge." *Id.* § B(3).

26. After completion of Phase 1, the Initial Agreement provides that "[e]ither Party may forthwith terminate this Agreement by giving written notice to the other Party if the other Party . . . [h]as committed a material breach of any of the terms and conditions on its part to be observed or performed and, if such breach be remediable, has failed to remedy the same within fifteen (15) days after notice to do so." *See* Ex. A § 18.1.

27. Should the Initial Agreement be terminated on account of a "material breach" after the completion of Phase 1 but prior to the completion of all four phases, STEA "shall be entitled to be paid by the [Galactic] for all Services carried out as of (and including) the date of effective termination and all works-in-progress, including sub-Seller's [*i.e.*, subcontractor] commitments with the work accomplished and paid for being the property of the [Galactic]." *See id.* § 18.2.

**B.    Upscaling the Air Tractor Fire Fighting System proved unfeasible, resulting in changes to the Project's scope of work.**

28.    STEA and Galactic began work on the 757 P2T Project in May of 2021.

29.    As provided in the terms of the Initial Agreement, the initial concept for the 757 P2T Project was to take Galactic's existing Air Tractor Fire Fighting System ("ATFFS"), originally designed for the "AT" series of single-engine, propeller-driven aircraft manufactured by Air Tractor Inc., and simply upscale the system to fit onto a much larger 757-200 aircraft.

30.    As the initial design work on the 757 P2T Project unfolded, however, it became apparent to STEA and Galactic that Galactic's ATFFS simply could not be upscaled to work with 757-200 aircraft for a number of reasons, including space constraints and the need to accommodate multiple retardant tanks.

31.    Galactic agreed in September 2021 that the Project's concept would need to change to reflect the impossibility of upscaling of the ATFFS and recognized that this change would result in additional design work above and beyond what was provided for in the Initial Agreement, including for development of retardant dispensing doors ("RDD") and retardant dispensing system ("RDS").

32.    In September 2021, STEA and Galactic agreed that Galactic would be responsible for developing RDD capable of being used in the 757 P2T Project in lieu of the ATFFS.  The parties later memorialized their agreement in Variation Agreement No. 1 (detailed below), in which Galactic expressly agreed it "shall be responsible for the engineering development and fabrication of the RDD, RDD shell and door mechanisms/components."

33.    Galactic, however, never fulfilled its obligation to design the RDD, despite STEA repeatedly warning Galactic that Galactic's delivery of the RDD design was a crucial gating item that was delaying overall design progress.

34.     In addition to scrapping the ATFFS that was intended to be the "baseline system" for STEA's work, Galactic also modified STEA's agreed-upon design work by insisting STEA satisfy new technical requirements for the 757 P2T Project after the Initial Agreement was executed and STEA had begun its design work.

35.     For example, Galactic's initial requirement for the 757 P2T Project was that the prototype aircraft to be able to perform two simple "missions" of operational capabilities during flight (Mission 1 and Mission 2) for the purpose of aerial firefighting.

36.     In late 2021, however, Galactic demanded STEA design the RDS—the hydraulics and related systems responsible for opening and closing the RDD—so that the aircraft was capable of carrying out a third type of mission ("Mission 3") that was much more complicated than Missions 1 or 2, with additional operational requirements.

37.     Mission 3 was outside the scope of the STEA's obligations under the Initial Agreement.

38.     Galactic's demand for STEA to complete Mission 3 required STEA to undertake a wide range of additional design work beyond what was agreed upon in the Initial Agreement, including designing a latch and lock mechanism for the doors employed by the RDS, ensuring that these doors would not endanger the ability of the aircraft to fly or land safely, and incorporating the sensors and indicators necessary for the aircraft's pilots to control and monitor the doors.

**C.    Galactic fails to promptly acquire a suitable aircraft and make that aircraft available to STEA for testing.**

39.     Every 757-200 series aircraft is unique, and every modification of a 757-200 aircraft requires taking into account the individual characteristics of the plane.

40.     In some instances, the aircraft OEM (e.g., Airbus or Boeing) can provide critical aircraft data—like load and finite element models—that are essential for carrying out the

modification design.  The sharing of such data enables the design process to begin while removing the need for pre-modification testing.

41.    In this case, Boeing was unable to provide Galactic with that data to pass to STEA—data that was needed to carry out the modification and ultimately to obtain the FAA's Supplementary Type Certificate (STC) for the converted aircraft.

42.    When such data is unavailable from the aircraft manufacturer, as it was here, STEA has a standard process through which it conducts a series of pre-modification tests, surveys, and scans to obtain the necessary data, including:

    a.    First, once the manufacturer's serial number (MSN) of the candidate aircraft is known, STEA conducts a series of checks, scans and sometimes physical surveys ("Pre-Design Survey") on the candidate aircraft prior to commencing design work in earnest, in order to ascertain the aircraft configuration and certain key information to determine suitability for conversion.

    b.    Second, STEA conducts a series of flight and ground tests of the aircraft ("Pre-Mod Tests") prior to commencing the actual physical modification of the aircraft; these tests are essential for many reasons, including that they establish baselines for use in effectuating the modification successfully and, crucially, in obtaining FAA approval for the aircraft to fly after completion of the modification.

    c.    Third, STEA conducts an additional series of flight and ground tests after the modification is complete to determine the effect of the modification on the aircraft, especially on flight performance.

43.    Under its standard process, if the candidate aircraft had been available, STEA would have conducted the Pre-Design Survey and Pre-Mod Tests for the Project in the summer of 2021.

44.    Because Galactic did not yet possess an airplane at the time that the Initial Agreement was executed, the Parties agreed to conduct the Pre-Design Survey after Galactic acquired a suitable aircraft and preliminarily scheduled the Pre-Mod Tests for October/November of 2022, immediately prior to when the actual modification of the aircraft was planned to commence.

45. Galactic understood when agreeing to the testing schedule that any subsequent delays in completing the Pre-Design Survey and Pre-Mod Tests would result in a corresponding delay in completing the modification. *See* Ex. A, Schedule A ("[F]or each day that the Actual Induction Date exceeds the scheduled Induction Date, the scheduled Redelivery Date shall be extended by one (1) day, subject to slot availability.").

46. More than a year after the initiation of the 757 P2T Project, Galactic still had not acquired a suitable candidate aircraft. As a result, STEA was forced to continue to work on the Project without the vital information that the Pre-Design Survey and Pre-Mod Tests would have provided.

### D. Galactic and STEA modify the terms of the Initial Agreement to reflect changing scope and circumstance of the 757 P2T Project.

47. In light of the changing scope of the 757 P2T Project and the delays caused by Galactic's ongoing failure to acquire a suitable aircraft, the Parties executed Variation Agreement No. 1 dated May 18, 2022 ("Modification Agreement"). A true and correct copy of the Modification Agreement is attached as **Exhibit B.**

48. Among other things, the Modification Agreement includes terms reflecting the revised division of engineering responsibilities between STEA and Galactic with regards to the 757 P2T Project.

49. Specifically, Schedule F of the Modification Agreement provides that STEA "shall be responsible [for] engineering development" of the following components of the RDS ("Seller Furnished Equipment"): (1) "Two retardant tanks with a total capacity of up to 7,000 gallons"; (2) "Tank venting / pressurization prevention mechanism and control unit"; (3) "E-Dump Control Unit"; (4) "Latch and Lock control Unit"; (5) "Standalone Hydraulic System"; and (6) "OLM system." Ex. B, Schedule F § (B).

50.     Consistent with the Parties' agreement in September 2021, Schedule F also provides that "[Galactic] shall be responsible for the engineering development and fabrication of the RDD, RDD shell and door mechanisms/components."  *See id.*

51.     The Modification Agreement extended the time for completing the 757 P2T Project from 30 months, as set in the Initial Agreement, to 39 months and provided the following timetable for the four phases:

- Phase 1: Feasibility Study and Conceptual Study Phase (3 months)

- Phase 2: Detailed Design Phase (9 months) [previously 7 months]

- Phase 3: Prototype Phase (18 months)

- Phase 4: Flight Test and Certification Phase (12 months) [previously 8 months]

*See* Ex. B, Schedule A.

52.     The Modification Agreement also included a table providing greater granularity to the schedule for non-recurring engineering and certification deliverables and milestone payments ("Non-Recurring Deliverables Schedule"). The schedule for deliverables articulated in the Non-Recurring Deliverables Schedule, excluding confidential payment information, is transcribed below:

| Deliverable No. | Description of Deliverables | Period after Signing of Contract |
|---|---|---|
| D1 | Conceptual Design Review | ARO + 3 months |
| D2 | Requirements Review | ARO + 6 months |
| D3 | Design Review 1 | ARO + 9 months |
| D4 | Design Review 2 | ARO + 12 months |
| D5 | Prototype Induction Readiness Review | ARO + 15 months |

| D6 | Pre-Flight Modification Test Results Review | ARO + 18 months |
| D7 | Supply Chain Readiness Review | ARO + 21 months |
| D8 | Certification Test Review | ARO + 24 months |
| D9 | Completion of Aircraft Prototype | ARO + 27 months |
| D10 | Ground Acceptance Test (GAT) Review | ARO + 27 months |
| D11 | Flight Acceptance Test (FLAT) Review | ARO + 33 months |
| D12 | Interagency Tanker Board (IAB) Review | ARO + 36 months |
| D13 | Completion of IAB Certification | ARO + 39 months |

Ex. B, Schedule B § B(c)(1).[2]

53.    The Non-Recurring Deliverables Schedule provides, like the Initial Agreement, that "[e]ach milestone[] will be reviewed periodically and payment only upon the completion of each task." Ex. B, Schedule B § B(c)(1); *see also* Ex. B, Schedule A § A (same statement in similar table).

54.    The Modification Agreement also reiterates the provision from the Initial Agreement that provides that "for each day that the Actual Induction Date exceeds the scheduled Induction Date, the scheduled Redelivery Date shall be extended by one (1) day, subject to slot availability." Ex. B, Schedule A § A(iv).

55.    The Modification Agreement further provides that the date STEA was to return the completed, certified, ready-to-use prototype aircraft to Galactic "is subject to further review in the event of" "[a]mendments to the work scope / work package." *Id.* § A(vi).

---

[2] Under the Modification Agreement, the ARO + dates continued to be measured from the execution of the Initial Agreement. *See* Ex. A, Schedule A ("The proposed start date for the project shall be 15th May 2021.").

56.    Despite the increasing costs imposed upon STEA, the Modification Agreement did not modify the total amount of money Galactic was required to pay STEA for its services. *See* Ex. B, Schedule B § A(1).

57.    The Parties, however, agreed in the Modification Agreement that the final price to be paid by Galactic to STEA for its services in conjunction with the Project was to be updated and mutually agreed upon prior to the start of the actual modification of the prototype aircraft. *See id.*

58.    Additionally, the Modification Agreement acknowledged that Galactic had yet to furnish a "candidate aircraft" to undergo the modification envisioned by the 757 P2T Project and set certain requirements for that aircraft.  *See* Ex. B, Schedule E ("Buyer Furnished Equipment/Component"); *see also* Ex. B, Schedule A (B)(2) (listing both the MSN and registration number for the candidate aircraft as "TBD").

59.    Schedule E of the Modification Agreement required that the candidate aircraft to be supplied by Galactic be in "serviceable condition" and that "any maintenance, overhaul, or replacement" of aircraft parts was outside of "the conversion work scope."  *See* Ex. B, Schedule E § B(4).

**E.    Even after the Modification Agreement, Galactic continued to change the scope of the 757 P2T Project.**

60.    Despite agreeing to the division of tasks articulated in Modification Agreement, Galactic quickly resumed moving the goalposts for the 757 P2T Project, further complicating STEA's design work and increasing STEA's costs.

61.    Galactic informed STEA in June 2022, less than a month after it executed the Modification Agreement, that it now wanted the 757 P2T Project to result in an aircraft design that facilitated even more complicated operational capabilities during flight beyond those of Mission 3 (a design assignment the parties referred to as "Mission 4").

62. Galactic and STEA had previously discussed whether the prototype should be designed to allow for those increased operational capabilities in February 2022, shortly before signing the Modification Agreement, but Galactic decided against it because of concerns with the viability of achieving those capabilities.

63. Notably, Galactic's about-face in demanding this change was not for any functional or design need but the result of Galactic's conclusion that an aircraft that could perform the kinds of flights that would require a Mission 4 design would be more appealing to the Australian market.

64. Galactic's abrupt change to the specifications for the 757 P2T Project more than a year after the Project's start and after the execution of the Modification Agreement required STEA to change the design for the prototype aircraft, which increased the stress on numerous mechanisms, and necessitated consideration of additional features.

65. In addition, during the Preliminary Design Review ("PDR") in October of 2022— a major milestone in the 757 P2T Project—STEA presented the RDD opening speed of its RDD design (the speed with which the doors go from fully closed to fully open). Again for the first time and only after the Modification Agreement had been executed, Galactic demanded that STEA increase that opening speed considerably.

66. This new speed requirement required a major redesign of the RDS, a process that ultimately took several months, required STEA to make changes to the design of the aircraft's accumulator and hydraulics, and necessitated that STEA employ components unintended for aviation use.

67. To be able to use these non-aviation parts in the aircraft, STEA would need, in turn, to obtain additional input and certification from the FAA.

F.    **Galactic failed to provide STEA with a candidate aircraft in a timely fashion.**

68.    While demanding significant changes to the Project that increased STEA's work scope and costs, Galactic still had not met its foundational obligation to supply STEA with a candidate aircraft for modification into the planned aerial firefighting platform.

69.    In December 2021, well over a year after the initiation of the Project, Galactic identified MSN 26647 as the "likely prototype," and reiterated in February 2022 that MSN 26647 was a leading candidate for modification.

70.    Based on Galactic's representations regarding MSN 26647, STEA subsequently engaged in design work premised on the MSN 26647 as the candidate aircraft, taking into account the aircraft's individual idiosyncrasies.

71.    Galactic, however, never ultimately took possession of MSN 26647 or made the aircraft available to STEA for the required Pre-Design Survey, which further hampered STEA's design work as it sought to prepare for the Preliminary Design Review milestone.

72.    By July 2022, Galactic still had not delivered to STEA the then-identified candidate aircraft of MSN 26647, so STEA and its team—in an effort to prevent further delays, prepare for the Preliminary Design Review, and meet the deliverable targets set forth in the Modification Agreement—obtained a substitute 757-200 aircraft similar in configuration to MSN 26647 from a third party to perform the Pre-Design Survey.

73.    STEA subsequently used the information obtained from the Pre-Design Survey of the substitute aircraft to carry out engineering studies, 3D modeling, and design presentations for the PDR in October of 2022.

74.    Shortly after the PDR, Galactic informed STEA that it had purchased a different plane—MSN 28167—and that this plane would now be the candidate aircraft for the 757 P2T Project.  This abrupt airplane switch necessitated STEA to check the new aircraft configuration

and details of the structure to determine whether its prior design work could be retained or would need to be redone for the new candidate aircraft.

75.    Based on the timeline set forth in the Initial Agreement and Modification Agreement, Galactic acquired the official candidate aircraft for converting into the 757 P2T Project's prototype aircraft only at ARO + 17, almost a year and a half after the Project began and more than two months past the date set by the Non-Recurring Deliverables Schedule for STEA to complete the "Prototype Induction Readiness Review," *i.e.*, "D5," a task that could not possibly have begun, let alone been completed, without a candidate aircraft.

        **G.    Galactic's choice of MSN 28167 as the candidate aircraft for modification proves to be ill-fated.**

76.    Galactic's choice of MSN 28167 as the candidate aircraft proved to be disastrous because the aircraft turned out to be a lemon.

77.    The first problem to arise with MSN 28167 was in connection with the aircraft needing to be "returned to service" so it could be turned over to STEA for the long-delayed Pre-Mod Tests.

78.    Galactic enlisted AerSale, the entity that assisted Galactic in purchasing MSN 28167, to return that aircraft to service.

79.    AerSale conducted the initial return-to-service work at its facility in Goodyear, Arizona.

80.    Returning an aircraft to service often involves some quantity of repair and maintenance work to make the aircraft flightworthy again, but yet again, this process took significantly longer than expected.

81.    MSN 28167 was not ready for "return to service" until May 2023—six months after Galactic purchased the aircraft in October 2022—when it left AerSale's Goodyear facility and relocated to another AerSale facility in Roswell, New Mexico.

### H.    Galactic represents that it is willing to agree to another contract modification to account for delays, STEA's expanded scope of work, and increasing costs.

82.     Galactic's delays and changes to the scope of the 757 P2T Project expanded the timeframe of the Project far beyond STEA's expectations and caused STEA to incur far more expenses and expend far more labor than was budgeted or planned under the agreed-upon scope of work in the Initial and Modification Agreements.

83.     In short, the 757 P2T Project had become a drain on STEA's resources and energies entirely out of proportion to the compensation STEA would receive under the existing terms of its agreements with Galactic (terms which Galactic had already disregarded and departed from).

84.     STEA repeatedly communicated its concerns about the expanded scope of work and increased expenditures, circumstances Galactic acknowledged as existing and in need of redress.

85.     As a result, STEA initiated discussions with Galactic for a second modification to the Parties' agreements in January 2023 while MSN 28167 was being returned to service ("Second Modification Agreement").

86.     After receiving a draft of the Second Modification Agreement, Galactic conceded that "if pressurization was one item that was not envisioned, [Galactic] can agree on some increase in cost."

87.     Although Galactic and STEA did not sign a Second Modification Agreement in January 2023, Galactic represented to STEA through its words, actions, and silences that STEA's needs were reasonable and that Galactic was committed to continuing to negotiate towards a Second Modification Agreement while work on the 757 P2T Project continued.

88.     It was only in light of Galactic's representations that it would negotiate in good faith to reach an agreement fair to both parties that STEA continued investing further resources and efforts into carrying forward the Project.

> **I.    STEA is forced to take over design work on the RDD, again expanding its scope of work above and beyond that provided for in the agreement with Galactic.**

89.     Around the time MSN 28167 finally left AerSale's Goodyear facility in May 2023, STEA was beginning preparations to undertake the Critical Design Review ("CDR") with Galactic, slated for September 2023 in Arkansas.

90.     Understanding that the CDR was intended to be the meeting where all the key design work on the 757 P2T Project was finalized and aware that Galactic still had not provided adequate designs for the RDD or related components (designs which contractually were Galactic's responsibility), STEA was forced to take over RDD design to ensure the CDR could go forward.

91.     When STEA informed Galactic that it would take over Galactic's design tasks, Galactic did not object or indicate that it would provide the RDD designs as required—a concession by Galactic that it could not provide the necessary designs and needed to shift design scope from Galactic to STEA.

92.     STEA subsequently completed the design for the RDD and presented it to Galactic at the CDR in September 2023.

> **J.    MSN 28167 is finally turned over to STEA for induction after yet more delays.**

93.     After being "returned to service" in May 2023,  MSN 28167 was ferried to another AerSale facility in Roswell, New Mexico.

94.     Galactic's decision to relocate MSN 28167 to Roswell proved to be unfortunate because when MSN 28167 arrived at Roswell in May 2023, there was inadequate hangar space

for storing the aircraft, and MSN 28167 was subsequently left exposed during a hailstorm, suffering extensive damage.

95.    In addition to the hail damage, other problems were also discovered in Roswell with regard to MSN 28167's hydraulic pump and emergency equipment, resulting in more delays as the aircraft underwent yet another round of repairs.

96.    The Non-Recurring Deliverables Schedule set forth in the Modification Agreement called for STEA to "induct" the candidate aircraft *i.e.*, take possession of the candidate aircraft, conduct the Pre-Mod Tests, and begin physical work on the modification of the aircraft, by ARO + 15, *i.e.*, August 2022.

97.    Because of Galactic's inability to timely find a candidate aircraft and properly prepare that aircraft to be turned over to STEA, STEA could not even begin the Pre-Mod Flight Tests until July 2023, *i.e.*, ARO + 26, almost a full year later than the Modification Agreement contemplated their completion.

98.    Moreover, by the time MSN 28167 was finally made available to STEA, STEA's affiliate in Mobile, Alabama, no longer had sufficient hanger space to accommodate Pre-Mod Testing or the subsequent modification.

99.    Thankfully, STEA was able to use its connections with another affiliate—San Antonio Aerospace ("SAA") in San Antonio, Texas—to obtain a suitable location for carrying out the modification after completion of the Pre-Mod Tests.  This, however, did not resolve the need to find a location for the Pre-Mod Tests.

100.    Galactic subsequently decreed that STEA should carry out the Pre-Mod Tests at AerSale's facility in Roswell and contract with AerSale to provide MRO services during those tests.

101.     Accordingly, contrary to previous plans and the terms of the Modification Agreement, Galactic forced STEA to send its testing team to Roswell in July 2023, instead of Galactic delivering the plane to STEA at a facility operated by one of its subsidiaries or affiliates.

102.     STEA's team finally began the Pre-Mod Tests on the aircraft on July 17, 2023.

103.     Completing the Pre-Mod Tests prior to commencing a modification is required when an aircraft's original manufacturer does not provide the full gamut data for the aircraft at issue, which was the case here.  Without completion of the tests, STEA could not obtain FAA approval for the converted aircraft to enter service.

104.     The tests also were required so that STEA would have the essential information needed to carry out design and engineering work to convert the aircraft for its new purpose.

105.     To conduct the Pre-Mod Tests, STEA had to hire highly specialized subcontractors including pilots, flight test experts, and others.  These individuals are in high demand in the aviation industry and operate on a regimented schedule.  Accordingly, when an aircraft is not ready for testing at the scheduled time, it loses its place in line, further compounding project delay.

106.     STEA estimated around the time that it began the Pre-Mod Tests that installing the requisite testing equipment, carrying out the actual tests, and making any necessary configuration changes between tests would require approximately 87 days such that, barring unforeseen delay, Pre-Mod Tests would be completed by the end of November or beginning of December 2023.

107.     Instead, the Pre-Mod Tests still had not been completed more than 15 months later, through no fault of STEA or its team.

108.    The delays in completing the Pre-Mod Tests were caused by technical problems with Galactic's aircraft, the slow pace of repair work conducted by Galactic's MRO subcontractor AerSale, and scheduling conflicts created as a consequence of the aforementioned technical and repair delays.

109.    Moreover, under the terms of the Modification Agreement, Galactic was required to provide STEA with a properly configured, fully functioning aircraft.  When Galactic turned over MSN 28167 to STEA for induction in July 2023, the aircraft was incapable of flight on account of the extensive hail damage and innumerable other technical shortcomings that arose during the course of the Pre-Mod Tests.

110.    STEA and its team attempted to mitigate the delay that MSN 28167's poor condition caused by initially focusing on conducting Pre-Mod Tests that could be performed on the ground.

111.    STEA and its team carried out the aforementioned ground-based testing throughout July and August of 2023, and took a short pause in testing in early September to accommodate MRO closure, public holidays, and aircraft preparation by AerSale.

112.    Ground-based testing briefly resumed in mid-September 2023 only to be halted again after only a week so that AerSale could begin work on repairing the extensive hail damage to MSN 28167—work that made it impossible for STEA and its team to simultaneously carry out any Pre-Mod Tests.

113.    Galactic assured STEA and its team that AerSale would quickly carry out the hail-related repairs so as to minimize any delay to the Pre-Mod Tests.

114.    Nevertheless, AerSale ended up taking more than four and a half months to repair the hail damage to MSN 28167.

115.    As such, STEA and its team could not resume the Pre-Mod Tests in earnest until February 2, 2024, *i.e.*, ARO + 33—the time period the Non-Recurring Deliverables Schedule designated for the prototype aircraft modification itself to be complete.

116.    While MSN 28167 was undergoing those lengthy repairs, STEA sent a revised version of the Second Modification Agreement to Galactic for consideration and feedback.

117.    Galactic did not object to any of the terms of the draft Second Modification Agreement, and instead simply informed STEA that it would need to consider the issue internally.

118.    Galactic never provided STEA with a definitive response to this draft of the Second Modification Agreement.

119.    Once again, STEA only proceeded with the 757 P2T Project at this juncture, incurring additional costs, because Galactic represented to STEA through its words, actions, and silences that it had every intention to negotiate a Second Modification Agreement that would compensate STEA for its additional expenditures, and that it was considering in good faith the latest draft agreement.

**K.    MSN 28167 is plagued by mechanical problems during flight-based portion of the Pre-Mod Tests.**

120.    MSN 28167's problems did not abate after STEA and its team resumed the Pre-Mod Tests in February 2024.

121.    If MSN 28167 been in acceptable mechanical and operational form in February 2024—event after all of Galactic's delays—STEA and its team still would have completed the tests by late February or early March 2024.

122.    However, the aircraft STEA and its team found waiting for them at Roswell in February 2024, even in the wake of months of repairs, was still unfit for the rigors of flight testing.

40

123.    Shortly after STEA's team returned to Roswell, STEA discovered that MSN 28167 had problems with its instrumentation, avionics, and rudder system that required yet another halt to testing-related work while AerSale carried out further repairs at Galactic's direction.

124.    Despite these additional repairs, MSN 28167 was still not ready to conduct even the first flight test when STEA and its team discovered a fuel leak at the end of February.

125.    The fuel leak required two weeks to repair—a delay that caused STEA's subcontractors to need to leave Roswell to conduct testing elsewhere.

126.    No sooner was the fuel leak fixed than a cracked cockpit window was discovered necessitating an additional 10 days of repair work.

127.    With Pre-Mod Testing once again off track and in the absence of any substantive response to date from Galactic to STEA's prior proposals for a Second Modification Agreement, STEA sent a revised proposal to Galactic for a Second Modification Agreement in April 2024.

128.    While Galactic did not agree to the specific substance of the proposal made in April 2024, Galactic represented to STEA that it continued to agree that an additional modification to the Parties' agreements was necessary and that Galactic would continue to negotiate with STEA in good faith while the 757 P2T Project progressed.

129.    STEA and its team briefly returned to Roswell in late March 2024 to conduct ground vibration testing while STEA and its team waited on pilots to become available to conduct the first flight-based tests.

130.    Immediately after the conclusion of the ground vibration tests, however, further testing was paused to allow AerSale to replace and/or overhaul MSN 28167's tires— repairs that required more than three weeks to complete and caused yet another scheduling conflict that

resulted in the loss of an additional two weeks while STEA and its team waited for pilots to become available.

131.    Around the time AerSale finally completed work on MSN 28167's tires, STEA and Galactic learned that AerSale was no longer willing to provide the hanger it had represented would be available for carrying out the flight-based portion of the Pre-Mod Tests.

132.    On account of the dissatisfaction with the quality of services provided by AerSale in Roswell and the absence of an available hangar, Galactic and STEA agreed to relocate MSN 28167 to SAA's facility in San Antonio, Texas, to complete the Pre-Mod Tests and commence the conversion.

133.    Galactic subsequently entered into a contract with SAA for SAA to provide MRO services, hanger space, and other necessities while STEA and its team completed the Pre-Mod Tests.

134.    Mechanical and instrumentation problems, however, prevented Galactic from relocating the MSN 28167 to San Antonio until May 19, 2024, at which point the Pre-Mod Tests team was once again unavailable on account of other testing obligations.

**L.    The engine leased by Galactic for use during the Pre-Mod Tests breaks down and must be replaced.**

135.    STEA and its team conducted the first official test flight of MSN 28167 on June 3, 2024, *i.e.*, ARO + 37, around the point in time where, pursuant to the Non-Recurring Deliverables Schedule, the prototype aircraft should have been in the process of obtaining the final certification necessary to enter service as an aerial firefighting platform.

136.    On June 12, 2024, while STEA was conducting another test flight, Engine #2 on MSN 28167 surged unexpectedly, emitting smoke.  As a result, STEA was forced to pause testing and raised concerns that Engine #2, which Galactic had leased for use during testing against STEA's advice, might be unsuitable for use.

137.    STEA and its team resumed testing the following week based on the understanding that Galactic had repaired Engine #2.

138.    Nevertheless, another malfunction in Engine #2 caused STEA and its team to have to abort a test flight during takeoff on June 24, 2024.  STEA subsequently informed Galactic on June 30 that Engine #2 was no longer able to achieve the thrust levels required to carry out testing and had to be replaced.

139.    Galactic required roughly a month to find and to install a replacement for Engine #2, during which time all testing was paused and STEA's team once again had to leave the test site to fulfill other obligations.

**M.    Galactic again represents that it intends to enter into a Second Modification Agreement.**

140.    With flights tests on pause yet again, STEA resumed engagement with Galactic regarding the need for a Second Modification Agreement.

141.    As STEA explained to Galactic during discussions in June and July 2024, to proceed with the Pre-Mod Tests, STEA had to enter into a wide range of agreements with various subcontractors to obtain the parts, tools, pilots, and other services necessary to carry out the tests.

142.    In response, Galactic insisted that STEA should cover essentially all of the costs associated with the Pre-Mod Tests, including increased costs resulting from the delays caused by mechanical problems and repairs for which Galactic was responsible.

143.    Although the parties did not reach agreement during those June and July discussions, Galactic continued to string STEA along, offering assurances that it was considering the issue in good faith and intended to enter into a Second Modification Agreement with Galactic.

### N.    Galactic rejects STEA's proposal for Second Modification Agreement

144.    STEA reached out to Galactic yet again in August 2024 about the need to reach a Second Modification Agreement if the 757 P2T Project was to continue.

145.    At an in-person meeting in Little Rock, Arkansas, with Galactic's leadership, Galactic for the first time rejected STEA's proposed amendments to the agreement governing the Project and disputed Galactic's obligations under the terms of the Initial Agreement and Modification Agreement.

146.    In response to the new proposal, Galactic raised belated concerns about its ability to absorb any increased payment obligations to STEA in connection with the 757 P2T Project, a year and a half after STEA first requested a Second Modification Agreement and a year and a half into STEA incurring additional costs in reliance on Galactic's willingness to modify the applicable payment terms.

147.    Seeking a good faith resolution, STEA offered to allow Galactic to defer certain portions of the proposed payments to 2026 when the 757 P2T Project was anticipated to begin bearing financial fruit for Galactic.

148.    Galactic led STEA to believe such an arrangement would be acceptable but continued to put off providing any definitive response to STEA's draft Second Modification Agreement.

### O.    STEA loses faith that Galactic will ever agree to a Second Modification Agreement fair to both parties.

149.    Throughout all of the proceeding events, STEA and its team continued working to advance the 757 P2T Project, believing that Galactic was acting in good faith to arrive at a mutually agreeable Second Modification Agreement that would take into account STEA's

expanded scope of work and increased costs as a result of the incessant delays caused by Galactic.

150.    In the second half of 2024, however, it was becoming clear that Galactic was not engaging in good faith discussions to reach a fair Second Modification Agreement and instead was purposefully dragging its feet.

151.    STEA's doubts as to Galactic's intentions were heightened when Galactic instructed STEA during a meeting held in late July 2024 to cease making additional financial commitments related to the 757 P2T Project and began pressuring STEA and its subcontractors to "wrap up" the Pre-Mod Tests despite several key test flights remaining undone.

152.    These instructions came at a remarkably inopportune moment because STEA and its partners, in compliance with Galactic's repeated instructions to move the Project forward more quickly, had begun production on the materials necessary to effectuate the actual conversion of MSN 28167 into the planned prototype aerial firefighting platform.

153.    As a result, STEA found itself in the untenable position of informing the subcontractors and affiliates it had repeatedly urged to rush on Galactic's behalf to now pause their work.

154.    This sudden about-face not only raised concerns with these partners and subcontractors about working on this project, but also damaged STEA's reputation.

**P.    Galactic fails to make payments to San Antonio maintenance facility, shutting down testing.**

155.    In September 2024, Galactic made an already difficult situation worse by entering into a contractual dispute with SAA.

156.    Galactic decided that it wanted to relocate MSN 28167 to a site in Arkansas for the remainder of Pre-Mod Tests and the modification.  At the time, MSN 28167 was in storage at

SAA's facility until Galactic and STEA reached the anticipated Second Modification Agreement and could resume the Pre-Mod Tests.

157.    Neither SAA nor STEA objected to Galactic's decision to relocate MSN 28167 to a site of its choice. SAA, however, did object to the fact that Galactic had failed to fulfill its payment obligations under the terms of its MRO contract with SAA related to storing and maintaining MSN 28167 at SAA's facility.

158.    As a result, SAA responded by stopping maintenance work on the aircraft, moving it out of the hanger and depositing it in a remote area of SAA's facility.

159.    Then, while investigating the aborted takeoff on June 24, 2024, the FAA discovered that MSN 28167 was sitting in the open air and without maintenance since September 6, 2024, and launched an investigation into whether Galactic had been neglecting the aircraft.

160.    After learning of the investigation, Galactic accused SAA of providing the FAA with false information, an act that Galactic claimed constituted a federal crime.

161.    Galactic informed STEA in late September 2024 that STEA needed to help Galactic resolve its dispute over MRO costs with SAA and warned STEA that Galactic's "investors [are] becoming more concerned about the fate of the project."

162.    STEA was able to facilitate the resolution of the dispute between Galactic and SAA in mid-October, allowing Galactic to ferry MSN 28167 to its preferred MRO facility in Arkansas.

**Q.    STEA is forced to stop work on the 757 P2T Project to mitigate its losses.**

163.    By October 2024, STEA felt making additional financial commitments on behalf of Galactic posed serious financial risks, and STEA's subcontractors were insisting on purchase

orders or contractual commitments before undertaking additional work related to the 757 P2T

Project—commitments STEA could not make given the circumstances.

164.    In light of the loss of faith in Galactic and ever-increasing expenses STEA was

being forced to incur on Galactic's behalf, it was essential to STEA that Galactic demonstrate its

commitment to the Project so that STEA could get these essential subcontractors back on board,

which was necessary to have any chance to convert the MSN 28167 in a timely fashion.

165.    On or about October 25, 2024, STEA informed Galactic it would not be able to

continue with the 757 P2T Project under the current circumstances.  As a potential path forward,

STEA proposed the following:

- Galactic and STEA would (roughly) split the MRO costs associated with the time MSN 28167 spent at AerSale's facility in Roswell, New Mexico, and SAA's facility in San Antonio;

- Galactic would cover the expenses incurred by STEA in furtherance of the 757 P2T Project up until the current date; and

- Galactic would review the cost escalations brought to its attention by STEA within two weeks.

166.    Galactic responded on October 30, 2024, that it agreed to the first and third

requests but refused to cover any of STEA's increased expenses.

167.    In light of Galactic's refusal to address the increased Project costs its own actions

and failures had caused, on November 6, 2024, STEA was forced to issue a "Notice of Work

Stoppage."

168.    In connection with the "Notice of Work Stoppage," STEA informed Galactic that

it would resume work on the 757 P2T Project if Galactic and STEA arrive at a "mutually

agreeable commercial arrangement."

169.    The week after Galactic received the "Notice of Work Stoppage," Galactic sent

STEA a draft Second Modification Agreement.

170.    Tellingly, Galactic sent its draft Second Modification Agreement only after STEA was forced to send the Notice of Work Stoppage and only after stringing STEA along for more than a year and half while STEA worked diligently on the Project with feigned promises by Galactic of a Second Modification Agreement.

171.    Continuing its pattern and practice, Galactic ostensibly continued to discuss a Second Modification Agreement and the resumption of the 757 P2T Project with STEA from November 6, 2025, through March 2025.

172.    Galactic, however, abruptly broke off those business discussions and instead brought suit against STEA, spuriously accusing STEA of breach of contract and trade secret misappropriation in a transparent attempt to apply bargaining pressure and put off having to make payments.

173.    STEA files these Counterclaims to seek redress for Galactic's clear breaches of its promises to STEA and its bad faith conduct throughout the Project.

<u>**COUNT I**</u>
**Breach of Contract**

174.    STEA restates and incorporates by reference all of the foregoing paragraphs of this Counterclaim as if fully set forth herein.

175.    STEA possesses a valid, legally binding contract with Galactic in the form of the Initial Agreement as amended by the Modification Agreement ("Agreement").

176.    Galactic has breached its obligations under the Agreement by, among other things:

    a.    failing to make payments to STEA required by the Agreement;

    b.    failing to provide a suitable and serviceable candidate aircraft to STEA in a timely fashion pursuant to Schedule E § B(4) of the Modification Agreement;

    c.   failing to pay STEA for the additional engineering services STEA carried out at Galactic's express or implied request at the agreed-upon hourly rate pursuant to Section B(1) of Schedule B of the Modification Agreement;

    d.   failing to compensate STEA and its subcontractors for their work on the 757 P2T Project, pursuant to Section 18.2 of the Initial Agreement;

    e.   failing to "support the development of the engineering package" by not fulfilling its obligations under Section B(2) of Schedule A of the Modification Agreement;

    f.   failing "to provide at no cost to [STEA], access to all applicable design data … in a timely manner" pursuant to Section (A) of Schedule E of the Modification Agreement;

    g.   failing to perform its obligations under the Agreement in good faith as required by the laws of Arkansas; and

    h.   failing to abide by its duty of good faith and fair dealing in considering adjustments to the Agreement's timetable for deliverables and aircraft price, as required by Schedules A and B of the Modification Agreement.

177.    Galactic also breached its obligations under the Agreement by, among other things:

    a.   demanding STEA take on responsibilities and incur expenses beyond the scope of work provided for by the Modification Agreement and not compensating STEA for that work;

    b.   providing STEA with a candidate aircraft whose parts and components were not in "serviceable condition," thereby causing STEA to waste effort and resources in the form of, *inter alia*, unnecessary trips, cancelled trips, schedule changes, and test re-coordination; and

    c.   violating its obligation under the laws of Arkansas not to prevent, delay, or hinder the performance of its counterparty, including by failing to timely deliver or perform its obligations under the Agreement, including as to delivery of a aircraft and design work assigned decision to provide STEA with a candidate aircraft.

178.    As a direct and proximate result of Galactic's violations of its contractual obligations to STEA under the Initial Agreement as amended by the Modification Agreement, STEA has suffered substantial costs and incurred financial losses.

## COUNT II
### Unjust Enrichment

179.    STEA restates and incorporates by reference all of the foregoing paragraphs of this Counterclaim as if fully set forth herein.

180.    STEA provided Galactic engineering, logistical, procurement, and other services worth multiple millions of dollars.

181.    Galactic was not entitled to the benefits derived from STEA's efforts because these efforts went above and beyond the actions and expenditures STEA was required to incur under the terms of the Initial Agreement as amended by the Modification Agreement.

182.    Galactic made persistent representations between January 2023 and November 2024 that it was negotiating in good faith a Second Modification Agreement that would compensate STEA for the engineering work done and expenses incurred outside the scope of STEA's contractual agreements with Galactic.

183.    Because of Galactic's misleading conduct, STEA provided to Galactic engineering work related to Galactic's proposed aerial firefighting platform worth multiple millions of dollars and for which Galactic has never provided STEA compensation.

184.    STEA additionally expended millions of dollars procuring services from subcontractors on Galactic's behalf and for which Galactic has never provided STEA compensation.

185.    As a result of the above conduct, Galactic has been unjustly enriched at the direct expense of STEA, and STEA is entitled to recover compensation from Galactic commensurate with the enrichment unjustly obtained by Galactic.

## COUNT III
### Tortious Interference with a Contract

186.    STEA restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

187.    STEA possesses valid, legally binding contracts with subcontractors involved in the 757 P2T Project.

188.    Galactic was aware of STEA's contractual obligations to its subcontractors at all times relevant to this litigation.

189.    Galactic specifically intended to cause harm to STEA by, *inter alia*, refusing to compensate STEA for the services STEA procured on Galactic's behalf and interfering with STEA's contractual obligations with those subcontractors.

190.    Galactic was not justified or privileged in their intentional interference with STEA's obligations to its subcontractors.  Nor was Galactic's interference reasonably related to the protection of a legitimate business interest.

191.    As a result of Galactic's interference, STEA has suffered harm and monetary damages.

## COUNT IV
### Promissory Estoppel

192.    Galactic represented to STEA that it would continue to negotiate and execute in good faith a Second Modification Agreement that would provide reasonable and appropriate compensation to STEA for its out-of-scope work and the costs STEA incurred as a result of the delays Galactic caused with regard to the 757 P2T Project.

193.    Galactic made these representations to induce STEA to continue working on and investing in the 757 P2T Project.

194.    STEA acted in reasonable reliance on Galactic's representations, expending additional effort and resources because it believed Galactic's promise to negotiate and execute a reasonable and fair Second Modification Agreement.

195.    Galactic knew and understood that STEA was continuing with the 757 P2T Project in reliance on Galactic's representations.  In fact, Galactic conducted the negotiations of the Second Modification Agreement precisely in a manner to induce STEA to continue investing effort and resources into the Project for as long as possible without Galactic having to execute a final Second Modification Agreement.

196.    The only means to avoid injustice in this situation is for Galactic to be compelled to provide STEA fair compensation for its out-of-scope work, expenses incurred on Galactic's behalf, and all other reliance costs incurred by STEA as a result of its reliance of Galactic's promises and representations.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, STEA hereby demands a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant, STEA, respectfully requests relief as follows:

(a) compensatory damages in an amount to be proven at trial suffered as a result of the unlawful conduct alleged herein;

(b) disgorgement of the value of the labor and services provided to Galactic without compensation;

(c) reasonable attorneys' fees and costs;

(d) pre- and post-judgment interest; and

(e) such other and further relief as this court may deem just and proper.

Dated:  August 27, 2025                    Respectfully submitted,


                                           /s/ David D. Wilson
                                           David D. Wilson (AR Bar No. 90112)
                                           Friday Eldredge & Clark LLP
                                           400 West Capitol Avenue, Suite 2000
                                           Little Rock, Arkansas 72201
                                           Telephone: (501) 370-1564
                                           Email: wilson@fridayfirm.com

                                           Patrick J. McElhinny (*pro hac vice forthcoming*)
                                           Christopher M. Verdini (*pro hac vice forthcoming*)
                                           Anna Shabalov (*pro hac vice forthcoming*)
                                           K&L GATES LLP
                                           K&L Gates Center
                                           210 Sixth Avenue
                                           Pittsburgh, PA 15222
                                           Telephone: (412)-355-6500
                                           Facsimile: (412)-355-6501
                                           Email: patrick.mcelhinny@klgates.com
                                           Email: christopher.verdini@klgates.com
                                           Email: anna.shabalov@klgates.com

                                           *Counsel for Defendant ST Engineering*
                                           *Aerospace Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025 the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ David D. Wilson
David D. Wilson
Friday Eldredge & Clark LLP
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
Telephone: (501) 370-1564